We will now turn to the last case on the argument calendar for today. United States of America v. Whitehead 24-1769. Mr. Nelson, you look like you're ready to go. I am ready to go, but it seems like I'm still using prior counts this time. We're going to give you a full count. I understand you would like to reserve three minutes for rebuttal, right? Yes, Your Honor. Can I just ask you at the outset, and maybe you'll have a different view, on your venue claim, I guess people can argue about waiver or whatever, but I understand the Supreme Court just granted cert on that issue in Abu Amal. Are counsel aware of that? Is that, in anyone's view, a reason why we should simply be holding the case? Is there some reason our cases can be decided on that? The venue issue can be decided without us waiting for the Supreme Court? It's sort of a housekeeping issue. I'd be curious if both parties could express a view on that. Well, Your Honor, obviously our position is that this Court should reverse on other issues without having to wait for the Supreme Court to decide. On other issues? On the other issues that we've raised. But as to that count, I thought the false statement count, the only challenge you had to that was venue. Were there other challenges to the false statement count? Well, we are arguing that some of the other errors we raised do affect that count. No, in terms of claims. There are trial errors that are asserted, which punitively would apply to across the board. Yes, but in terms of. . . Oh, you think the other ones infect the false statement count, too? No, that's fine. I'm just trying to figure out the contours of the buckets of things we need to decide. I guess I had come into this under the impression that, you know, like Belmonte's invocation of the Fifth went to the extortion and fraud counts and everything. I didn't think that you had raised any other arguments with respect to the venue, with respect to the false statement count, so that we'd have to wait because we have to dispose of that challenge one way or the other, unless you tell me that, yeah, you think there are other things that undermine that count. Well, we did argue that the trial errors, while directly affecting other counts, do indirectly affect the whole case, which would include that count. But that's just sort of a whole totality of the circumstances thing that's not specific to. . . Correct. I mean, I get it. You think. . .  Okay. All right. That's fair. In terms of the direct arguments on that count, yes, it's the venue. And, yes, we would submit that the Supreme Court case, which I'm not as familiar with it as I should be. . . I think they just granted it. But it has at least some. . . that it could have at least some relevance and that hence. . . Well, and either way, even if there would have to be a new trial based on the trial errors, even as to the false statement count, the argument about venue has a more significant impact, which is the case would have to be that that count would have to be excised completely, right? Yes. And that would have to happen if the Supreme Court issues its decision post-remand also. Right. Yeah. I mean, you're looking for a judgment of acquittal on that count, right? Correct. Yeah. So that would. . . If you win and hypothetically, let's say the Supreme Court went your way and you were definitive, then there is a world, a potential future path where you just win on that count. Okay. Yes. All right. Well, thank you. I would be interested in hearing the other side's view on that as well, but it derailed you, so if you would maybe just reset the clock.  And you follow whatever argumentative path you want. Well, our position, Your Honors, is that this case falls within the Zappola case in terms of how the district court dealt with Brandon Belmonte's Fifth Amendment invocations. The Zappola holds that where a defendant calls a witness who is a confidential informant in this case, Fifth Amendment invocations have to be adjudicated on a question-by-question basis, even if in the interim the informant picks up another similar case. Now, to address a couple of issues cited by the government, first of all, relatedness of this case to the new charges against Belmonte. They're arguing that the Eastern District charges against Belmonte relate to the luxury auto business, which is connected to the body shop, the hip bones connected to the thigh bone. That, however, is count three. Even leaving that aside, count two relates, doesn't relate to the body shop or the luxury business at all. That relates to allegations that Mr. Whitehead promised favors from the mayor regarding some buildings in Manhattan. Is there relatedness of the count matter? I thought you just said it's a question-by-question basis. So if they ask questions about whether he tampered with recordings that he gave to the FBI, would that have implications for the criminal charges against him? Well, if we look at the questions that were actually asked of him at 636 to 639 of the appendix, many of those questions, at the beginning they're primarily related to count two and to the relationships between the parties. I mean count three, apologies. But then somewhere around the middle of page 637, they switched to questions about count two, relating to the buildings in Manhattan, the alleged fraud, and, you know, regarding the Mayor Adams. And there's not even a theoretical relationship between those questions and the Eastern District charges. Was there a severance request here of the counts? There was not a severance request. So in the absence of a severance request, now he's on trial, your client is on trial for all of these charges, and no one tried to break them up. And now a gentleman comes into court as a possible witness, and he's asked the question, did you tamper with the tapes that the FBI, you know, in the course of the time that you were recording things at the behest of the FBI? If he says yes, doesn't that incriminate him? Well, I would point out that's one of the... It doesn't matter whether it relates to this case or some other case. His ability to invoke the privilege turns on whether the answer could tend to incriminate him. Well, two answers, Judge, as several of the prior counsels have said. First of all, the Zappola case itself involved tapes which were admitted at trial for their content and where there were issues about, you know, the authenticity and the interpretation and what was on those tapes. And this Court still said that Fifth Amendment invocations had to be adjudicated on a question-by-question basis, even if arguably... I'm not disputing that proposition. I'm asking give me a question where if the invocation of the Fifth is assessed on a question-by-question basis, the invocation of the privilege would be inappropriate. Well, let's start with have you owned any multi-unit buildings in the Bronx in 2022? Were you ever the owner of 3160 Villa Avenue? Did Lamar Whitehead ever tell you that he could remove a stop work order by calling the mayor and getting it removed? You're setting a case law about his work as a C.I. I mean, isn't it more straightforward that he says, do you have any proffer grievance for working with the FBI? Did you make the recordings with the FBI? Yes. Like that would not incriminate him, right? It's like just his behavior as a C.I., right? Not only is it that, but it's in the exact list of questions that the Zappola court said that could be asked. The Zappola court listed five things, time and place of meetings, who was present, whether it was tape recorded, substance of conversations, and who said what. That these were questions that could legitimately be addressed to the C.I., even though he had picked up another similar case in the meantime. So let me just ask you this. Let's assume for the sake of argument that we would agree with you. Let's say a few of these questions that you've just mentioned would fall outside the scope of the Fifth Amendment. Let's say the one, you know, what was the one about, do you have any proffer agreements working with the FBI? Let's take that one. That's only a problem if it violates your client's compulsory process rights under the Sixth Amendment, right? I mean, is that the claim you're making? Well, yes. I mean, that's the source of the violated right. Correct. Is there a different source of the violated right you're saying? Well, that- Besides the compulsory process. In general, the right under Chambers to present the full and meaningful defense. Okay, so due process. Due process, and that arises from compulsory process. So I guess my question there is, do you have any proffer agreements? That is the kind of thing that I thought would only be relevant material to the defense to impeach Belmonte, right? So you're a liar, right? You have an incentive to lie. But the problem is he didn't have any of his statements introduced for the truth. The only Belmonte statements that came before the jury were on the recordings, and the court gave a limiting instruction saying that do not accept them for the truth, only accept them to the extent they provide context or Mr. Whitehead adopts the statements, or there was one other thing. So I guess my question is, and maybe it sounds in harmlessness in a way, is how does that really violate your client's ability to present a meaningful defense? You know, what is it about these particular statements that would have been probative of his innocence or probative to defeat an element of one of the charged offenses? Well, I would refer, first of all, back again to the Zappolla case, which talks in terms not of recordings being admitted for their truth, but recordings being admitted for their content, which I would submit is a difference of waterfronts. So just walk me through, though. Walk me through how the proffer agreement question helps your client. Let's say he hadn't invoked the fifth and he had said yes. Do you have any proffer agreements working with the FBI? And the answer was yes. I'm not sure where that goes. I mean, didn't the jury know he was cooperating with the FBI? Well, the jury knew he was cooperating with the FBI. Yeah, so what on earth is a proffer agreement? A proffer agreement is actually a lesser included thing of a cooperation agreement. You don't even get the benefit of cooperation. So it's sort of like a halfway teaser towards a cooperation agreement. Tell me how a yes answer, if that had been properly brought to the jury, could have been relevant and material and even vaguely outcome changing. It was Mr. Whitehead's position all along on this case that Belmonte started the whole ball rolling, that this started out as a sting against Mayor Adams. Yeah, but that was excluded, right? I mean, that's not relevant, that it was a sting against Mayor Adams. Who cares why they stumbled into this? I don't understand why that matters here. Unless we're going into some of these basically irrelevant defenses. And I guess if you're falling back on the irrelevant defenses, that you're sort of an investigative technique, what was the motivation of why the FBI looked at Mr. Whitehead in the first place? Who cares? Once they started looking at him, the question is, did he commit a crime? No. So is that it? I mean, is it only that if you go back to these irrelevant defenses, like was it a sting operation, that these questions become relevant? Or tell me how they negate an element of any offense. I think it could go in the argument to the jury to the issue of whether Mr. Whitehead committed a crime or whether Mr. Belmonte manufactured a crime. But they listen to his words. They listen to Mr. Whitehead's words on the tape. So I guess I'm not understanding. So tell me what element of which offense is negated by this idea that Belmonte came up with the idea as a sting operation. Because that's not the question. The question is, what did Whitehead do and say? Well, one of the questions asked of Whitehead was, did he tamper with the tapes? And I would say- Well, that seems like that's- but going back to Judge Lynch's question, that's basically saying, did you obstruct justice pursuant to 18 U.S.C. 1503? That's a perfectly good Fifth Amendment answer. Say, whoa, you're asking me, did I commit a crime? Did I tamper with evidence? Of course you can take the Fifth as to that. I'm talking about some of these other questions like, do you have a proper agreement with working with the FBI? Well, what about, you know, did the questions addressed to, did Lamar Whitehead ever tell you he could remove a stop work order? But that's on the tape. Well, it goes to interpretation of the tape. Whether this tape was an intentional fraud or whether it was- Did you get to explore the question of the authenticity of the tapes and the chain of custody and so on by questioning the FBI agent? Well, that's not a substitute for questioning the person who actually made the tapes and who recorded them outside the presence of the FBI. Right. Is there something that Belmonte would have testified to that we think would have changed the whole way that that argument was explored and- Well, certainly Mr. Whitehead thought, his tactic here was he believed that if, you know, Mr. Belmonte would put on the spot and given the context of these conversations, including not only what was recorded but what happened before and after the recordings, that it would put a different view on the case as to whether this was fraud or puffery or- I understand that. That's sort of a generic atmospheric. I get that. But we're not dealing in general atmospherics, right? We're talking about would it be probative or not of something that would have a tendency to make the jury believe or disbelieve one of the elements of the offense. And tie it back to something concrete other than it would make the government look dirty because that's not a standard for admissibility. It's not a standard under the compulsory process clause. It has to have a meaningful effect on the relevance of some issue. We've got words on a tape. Words on a tape could be meant literally. They could be meant telepathically. And only Mr. Whitehead can tell you what he meant. It would be of no consequence to ask Bill Monty, did you understand this? I don't even understand what that means. Understand what the CI thought he meant? Well, Mr. How is that relevant? Well, where the CI and the party and the defendant have a longstanding relationship and course of dealing and where the CI would be in a position to know when this defendant is being serious and when he is puffing or bantering or joking, that's something that a jury might want to know. And what is the plausible basis for believing that Mr. Bill Monty was going to say I thought he was puffing? Because you can't just say I don't know. I was curious. I was going to take a shot in the dark. Maybe, maybe not. Maybe, maybe Bill Monty would have crushed Mr. Whitehead and his answers. But, you know, hope springs eternal. That's all I'm hearing. I release all I'm seeing in the briefs was, hey, look, I wanted to give it a shot because you never know. Maybe, maybe I get lucky with the question. We have to show a plausible reason to believe there was going to be something relevant and exculpatory in the answer. And I don't see a plausible basis. I mean, in general, counsel has to have a good faith basis for asking questions. That good faith basis could come from things that he was told by Mr. Whitehead. But you've got to tell us those. On review, we are supposed to figure out if there's a plausible basis for believing that. So we would not impute any bad faith conduct to defense counsel if you had the ability to ask the questions and you did. But now we're in a different standard for the compulsory process clause. You've got to give us a plausible basis for believing something helpful to your client was going to come out of Mr. Belmonte's mouth. Well, I would say that if the good faith basis was never put in question below by the government, that that would be, at the very least, an issue for a remand. That, look, maybe Belmonte would come through as the counsel below figured he would. Maybe he wouldn't. But the fact of the matter is, counsel never got a chance to ask. And if I can just go briefly to two other issues. First of all, the court's uncalled witness charge, which, let's be frank about it, was misleading. Wait a minute. Isn't that the one that we have repeatedly approved? Well. Just answer that. Have we not repeatedly approved it? You may then argue that this is a unique case in which it was inappropriate. But have we not repeatedly approved it? Yes. This court has approved it. So why fear is it wrong? Because it isn't so. It isn't so? Because this is not a case where the parties had an equal opportunity to call or not call these witnesses. Because the court had issued a ruling precluding Mr. Whitehead from calling them. But wait, wait, wait. The only witness that we've actually seen some argument about what they could do is Belmonte, right? Well, no. The other witnesses were excluded because their testimony wasn't relevant. And some of them are people I can't even – I don't even know whether they were mentioned in the course of the trial such that – if somebody was available to say something that was favorable to Whitehead or unfavorable to Belmonte or whatever, there's no reason to think necessarily that any of those people would be in the minds of the jury as someone who ought to have been called. So can you give me an example of someone who's – and if the witness's testimony is irrelevant, I don't see how it matters who they're available to or not available to. Unless either it matters or the jury would expect them to be there and would blame Whitehead for their not being there. So if you can give me one example of a witness as to whom that is so other than Belmonte. Well, we did argue both in the main brief and the reply brief that the – material evidence to give such as Kaplan would have been able to testify that Pauline Anderson didn't need any assistance from Whitehead in obtaining a mortgage as opposed to – Well, right. But that goes to the question of whether they were properly excluded. And that's not one of the arguments that you're making, I think, on appeal, is it? Well, no. That's not one of the – Don't we have to assume that the answer is there was nothing that the person had to offer that was relevant? And as to the second half, is there anything in the record that shows that the jury knew about Mr. Kaplan's identity and wondered – would wonder why it is that he's not being called? Because that's what the unquote witness instruction is about. It is about trying to tell the jury what to do if there's somebody that you've heard about and you might think there should be some inference drawn. Here's what you do. Well, if – I believe, Judge, although I cannot cite specific parts of the record here in front of you, I believe their names came up. I would submit as well that there would be no need for anyone to request an uncalled witness charge in the first place if their names had not come up. That's not necessarily true. I was a trial judge for ten years, and the government would submit a voluminous list of things that they wanted me to instruct. And I did a lot of crossing them out because they weren't really relevant to the particular case. So I don't know. Maybe the judge wouldn't have given it if she didn't think there was something relevant. But you think the uncalled witness charge is a problem because of Belmonte, not because of other witnesses, right? Well, it's both Belmonte and the other witnesses, but certainly Belmonte. If it's Belmonte – and this is why I sort of excluded him from the question because the other people are different. If it's Belmonte, isn't this really an argument that the government could have given him immunity on which there is a huge body of law that's not cited by either party in this case? But that's the only way that he is more available to the government than he is to the defendant is that they have the power to take away his Fifth Amendment privilege and you don't. Yes, and that's true, and that is something that, again, doesn't – puts them on an unequal basis. Well, but isn't the reason why you didn't rely on all of those cases is those cases are not very favorable to you, that there are virtually no cases where we've ever said that the government is obliged to give immunity to a potential defense witness. And probably the last place that you get an exception to that is where the most likely thing is that the witness would testify in a way that is harmful to the defendant except for the fact that then you could spend a lot of time saying that a liar and a thief and a terrible guy he is. Well, you're correct, Judge, that we didn't argue that the government was obliged to grant immunity to Mr. Belmonte, and you're correct about the reason. However, the fact that the government was not obliged to grant immunity to Belmonte means that it still can. So if the government had decided to call Belmonte, if the government decided that Belmonte had favorable testimony to give, which presumably as a CI you figure the government would, then it could have given him immunity in court. We never hold, given this line of cases that Judge Lynch has cited, we never hold that because the government could choose to forego a prosecution in the Eastern District, could choose to give immunity, that therefore he's now available. He's not available to the government because he took the Fifth. And I guess just to back up, it seems to me that the very premise of this argument is that you're concerned the jury drew adverse inferences against your client, that they would have inferred that he chose not to call Kaplan and that the reason he chose not to call Kaplan or others was because those witnesses would have said something adverse to his interests. Isn't that completely defeated by the instruction, which is the third sentence that says, therefore, you should not draw any inference or reach any conclusions about why neither party called a witness or what that witness would have testified if they had been called. So the concern, I think, evidenced in the blue brief, is that the jury was going to disobey that instruction and we have really solid case law saying we presume a jury obeys the court's instructions. They were told, do not do this thing. So I don't understand when the court expressly tells them, do not speculate why the person was not called, do not speculate what the person would have said, to now say, I think the jury read that and speculated about why they were not called and speculated about what they would have said. That because the instruction was given, they likely did the opposite. That's completely backwards. Well, again, two answers. Going back to the first part of Your Honor's question, if the government grants immunity to a witness, then the witness either has to testify or is held in contempt. So I would disagree that the witness was unavailable to the government. But our case law has said the opposite. I mean, that's just water under the bridge. I mean, again, it's not in the briefs because nobody really got to that point of saying, well, you know, because the government could immunize, he was available. But I assume the reason it's not in the briefs is because that would have been a completely losing proposition. We have so much case law that says the opposite. Are you saying there is case law that says that because the government – because I'm not aware of any. I'm only aware of case law saying the opposite. That a discretionary ability to immunize a witness does not thereby make somebody available. Unless you're telling me there's a case that says the opposite. Maybe I'm remembering the case law wrong. I don't know. It's an uphill argument. In any event, if I can finally just address the sentencing point under this court's recent Goldie case on sophisticated means. That sophisticated means has to be sophisticated by the standards of fraud schemes. And what we've got here is pretty garden variety. The lying about, you know, allegedly lying about assets using, you know, representing the business assets are personal or vice versa. Which case you cited a case? What case did you just say the court's recent decision? Which case? United States v. Goldie, G-U-L-D-I, 141 Fed 4th, 435. Thank you. Both an objective and a subjective element of sophisticated means. That the means not only have to be superficially sophisticated. But that they have to be more so than the average fraud scheme. And that what we have here is pretty garden variety. Why is it garden variety? I don't think I have the fraudulent bank statements and those things in the appendix. But I do have testimony of the person from Wells Fargo explaining why this is not a genuine bank statement. And it depends on lots of little details that you would point out between how Wells Fargo would do a genuine statement and how he would do a statement. So it looks pretty similar. It seems like it's pretty sophisticated forgery. Is that not correct? Certainly. I mean I've worked on a number of bank fraud cases over the years. And phony bank statements, phony tax returns, things like that. They come up all the time. Phony profit and loss statements. And these days with computers, it's very easy to make a convincing look at them. I think just to contrast that, we have two fraud charges here, right? One is the fraud against Belmonte. Yes. And one is the bank fraud or the lender fraud. Yeah. The sophisticated means enhancement was applied as to the Fundera application, right? Correct. Was it also applied with respect to the fraud against Belmonte? I believe it was not, Judge. So doesn't that just illustrate that the district court knows full well how to distinguish between cases where there are so many frauds. Well, you just lie. You just lie to somebody. There are tons of people who are prosecuted for just lying in a bald-faced way and don't get the enhancement. It may be that most people who wind up getting prosecuted for this kind of thing, submitting complicated backup financial statements to a bank, yeah, maybe they often get the sophisticated enhancement. But that doesn't mean that all fraud claims are getting the enhancement. It just may mean that this particular subset of claims which follow this particular path, they are different from run-of-the-mill, I'll sell you the Brooklyn Bridge. Well, it's possible also that the district court's distinction that it drew was correct under the law at the time, but the sentencing occurred before Goldie, and the district court didn't have the benefit of Goldie in determining that there is a subjective as well as an objective element to sophistication. And given that I am way over my time, Judge, I will be as brief as possible on rebuttal, and I'll reserve at this time. We nevertheless look forward to having you back at the podium, Mr. Nelson. AYWSA, Kim. Thank you, Your Honor. May it please the Court, Jane Kim for the United States. I represented the government below at trial, and I represent the government on appeal. Just a housekeeping matter first. With respect to venue, our understanding is that a reversal based on venue here would result in a new trial that could be brought in a different venue. Oh, it wouldn't be acquittal? Yes. And so that's one point, but the second is we're happy to put in a letter, if the Court would like, with respect to the case that the Supreme Court recently granted cert. You know, that might be helpful if maybe by Friday each of you just gave us no more than a page of just what your view is of what this Court ought to do in light of the Supreme Court's cert grant. And it could very well be, Mr. Edelstein, you say, well, we should win anyway, even under Second Circuit's law as it currently stands, or you may take the view that we should hold the case at abeyance. I don't know. Whatever your view is, one page with a suggestion of what your view is on that. Absolutely. I want to start with the issue of Belmonte, and so there are a few issues at play here. The first is with respect to Judge Schofield's preclusion of Belmonte from testifying solely to invoke his Fifth Amendment rights. Here, that was plainly within the district court's discretion, and it would have been unduly prejudicial and confusing to the jury to have Belmonte take the stand solely just to invoke. But that assumes that it would be solely just to invoke. I mean, isn't it right that there are some questions about his activities as a CI that just are not plausibly criminal conduct? Like if they just say, did you work with the FBI? So on that point, there are sort of various problems. The first is that, as Judge Lynch identified, there are not questions that Belmonte could have answered or that defense counsel asserts that Belmonte could have answered that would have been relevant or permissible. And so they would have been excluded under Rules 401 and 403. So, for example— Well, I mean, you submitted the recordings, so if there's a question that just says, did you participate in these recordings, why couldn't he have answered that? The responses to those questions, Your Honor, and the responses to Belmonte's participation in this investigation, his identification of himself in the recordings, those all would have identified him as the owner of the auto body shop, the one who is engaged in business transactions with Whitehead. It would have identified him across the board in all of those recordings, some of which include him having conversations with Whitehead about his financial assets, about real estate properties, and those are all relevant to the Eastern District case where he's charged with bank and wire fraud in connection with his auto body and rental car business. And so those all would fall under his invocation because they relate to him and identifying him in the recordings. So he couldn't even acknowledge that he participated in an operation with the FBI or even acted as a CI? I think that he—based on the overwhelming evidence that includes Belmonte, it would have, again, identified him across the board. It would have identified and it would have affirmed that he was the one who made statements in all of these recordings. So it would have made the government's job easier in the Eastern District prosecution that they could say not only, hey, I have an FBI agent who comes up here and testifies. Yeah, I did a recording. I strapped the tape recorder to Mr. Belmonte's chest and all that, and I recognize his voice. But it would also say introduce Belmonte's own statement, and ladies and gentlemen, he even admits that he's the one on this tape. But the charges in the Eastern District are not about this transaction he had with Whitehead, right? They aren't about the transaction, but the reason why this case is wholly distinguishable from Zippola is that in Zippola, the confidential informant's work for the government was totally separate and unrelated to the charges against the informant in that case. Here, Belmonte worked with the government as an informant in connection with the extortion and attempted wire fraud count, and those were both – Extortion is over one particular car rental, right? Extortion was over – With the Eastern District, is he denying that he even owned the business? So the extortion count was with respect to a dispute that Whitehead had with Belmonte about money owed in connection with their – He gave him a rental car, and Whitehead said I don't think it was satisfactory. You should give me $5,000, right? That's what it was about. Yes. How is that possibly related to the prosecution of the Eastern District? It's related in the sense that at the heart of both of the charges in EDNY and Belmonte's statements in cooperation with the government here, those are related because they – the overlap is with Belmonte's business as an auto body shop owner, as operating the business, and so – So it would incriminate him if he acknowledged that he owned an auto body shop? Yes, because he – his charges are in relation to bank and wire fraud in connection with his ownership of that auto body shop. Is his defense in the Eastern District that he does not even own the auto body shop? I'm not sure, Your Honor, and respectfully, I'm not sure that that is necessarily relevant if it is a statement that would incriminate himself. Well, it's not illegal to own an auto body shop. Sure, but if you identify yourself as the owner of an auto body shop, from there comes – So you're saying even if they just – the question was just to ask him his legal name because that's the name on the caption in the prosecution of the Eastern District, he could plead the Fifth because it would incriminate him? Well, I believe he was asked his name and he did answer, and so I don't think that's our position. Fifth Amendment means he cannot be compelled to say what his legal name is. No, he did say his name and he was – He did say his name. Yes, he did. Fine. So if you're saying in the Eastern District the fact that he owns the auto body shop is an issue, like the fact that he's that guy is also an issue, so why couldn't he invoke the Fifth to not even mention his name? Your Honor, I suppose there's a world in which there could be that type of argument, but going back to your question about the auto body shop, the Fifth Amendment right against self-incrimination, it includes incriminatory statements that are both indirect and direct that would furnish a link to – A link in the chain of events that could lead to incrimination. Yes. And so otherwise, if he didn't have a right to invoke the Fifth as to the question, do you own the body shop, why wouldn't that be a question that the government could call him to the stand and ask him in his own trial if that's not incriminating? And you're saying of course they couldn't do that because that would be – there's nothing incriminating about owning a body shop, but if he has to – if he can be called by the government and asked such innocuous questions as, well, you at least admit that you owned this shop, well, the government is – it's the government's burden of proof and he has a right to stand silent and not answer those questions. So that's sort of the theory you're putting forward here, right? This is – if it's got any connection at all to that case, we don't know what defense he's going to offer. It hasn't come to trial yet. Yes, exactly. So he's preserving his options. People do – that's why they get called to the grand jury and take the Fifth, and they take the Fifth about everything but their name, maybe sometimes even including their name if that's something that is contestable. And the question is whether this is a legitimate link in a chain. Yes. Okay. That's exactly – So you're saying that even the question like did you have proper agreements with the FBI? Did you tamper with the recordings? He could plead the Fifth not because there's criminal liability for that, but because somebody would infer that because he answered that question, he must be the person on the tape, and therefore everything on the tape must be true and he must be owning a body shop. And there's some other allegations out there about his conduct at the body shop, and so therefore there's criminal liability for that? Yes, Your Honor. And so if he were to – again, if he were to identify himself as the person in all these recordings, he then would adopt all of his statements within these recordings. But then there's a secondary inquiry, which is whether or not those questions would have even been permissible at trial, and would they have been relevant? Would they have been – Well, that's a different question, right? So the argument on appeal here is whether the district court needed to do a question-by-question analysis. And you're saying it did not because anything about the identity of Belmonte is incriminating because he's the subject of a criminal investigation. I think – Any personal details about him or anything he's ever done is incriminating. I don't think we would go – Because he might defend on the ground that he's some other guy. I don't think we would go that far, Your Honor. But I think here, because unlike in Zappola, there is an overlap in the nexus between the EDNY case and his interactions with Whitehead are his business and his auto body business. And because the wire fraud relates to certain discussions about assets and real estate, that there are – that those topics and the overlap in those topics – I mean, I don't know why you need to insist quite so strongly that there need not be a question-by-question analysis, even if it's true. And I think it largely is that there should be a question-by-question analysis. If you did the analysis, first of all, for some of these reasons, it would come out that it is a valid implication of the Fifth. In some of them, whether or not it relates to the Eastern District case, if you're asked, did you tamper with tapes, the answer is one of two things. Yes, I did, in which case it's clearly an incriminating answer. Or no, I didn't, in which case it doesn't do anything useful for the defense. It just becomes an opportunity to then try to impeach his statement that actually favors the government by showing what a bad guy he is, which would be something that the court would presumably try to police. So, I mean, there are a lot of reasons why either it relates to the Eastern District or it's independently incriminating, or the failure to do an analysis about whether it might not be something to which the Fifth should not be allowed, it would be harmless. And so far, I haven't heard anything from the other side that suggests that they can meet – that there's even one question as to which the answers all take off in a way that prejudices the defendant. That's exactly correct, Your Honor. The defense has not been able to identify a single question that was posed of Belmonte that – where his invocation was not appropriate or where the question could have been – There wasn't an FBI agent who could testify about the chain of custody and the authenticity of the tapes, and Belmonte was the only one. You're saying he could still – he was unavailable, and so Whitehead would not be allowed to explore the authenticity of the tapes or the chain of custody. So here, Your Honor, there were eight recordings, and three of them were recordings that were made in connection with an FBI agent. And those were the principal recordings. They were the longest recordings, I think, by page number and transcript. They're around 82% of all the recordings. The remaining ones were ones that were made by Belmonte – bade by Belmonte. And I would just note there that it's the defense's theory that certain of those recordings – I think there's one in particular that they focus on – was potentially tampered with. But there is no indicia apart from what defense has cited that Belmonte offered the recording to the FBI after it was made rather than the day or the day after. There is no indicia that those recordings have been tampered with in any way. And so here, under Rule 901, those recordings were properly authenticated. The agent testified about identifying – If there were some indicia that it wasn't – like you're saying it's a totally outlandish argument. Let's say there were some reason to think that maybe there was some tampering. But Belmonte's invoking the Fifth Amendment across the board, what would happen? You wouldn't be able to introduce the recordings. So I think if you are able to satisfy Rule 901 and if the court balances in that hypothetical situation, 403, I think it depends on what the facts of that case would be. But here, we don't have that type of situation, and the recordings were properly authenticated. Well, if you did have that situation, then the government might be faced with a choice of whether to immunize Belmonte and have him testify. I mean, some way or other, those tapes have to be authenticated, right? You're saying they are authenticated in 12 different ways that don't involve Belmonte. Okay, fine. As a consequence, the defendant is not arguing that the tapes were not properly authenticated. If there were a situation where there was nobody who could say anything and nothing about the tapes that would give inherent indicia that they were authentic, and the only person who could testify to it was Belmonte, that wouldn't defeat Belmonte's opportunity to take the Fifth that he were called and ask, did you tamper with the tapes? But it would defeat the government's ability to offer the tapes because there would be no one and no thing and no circumstantial evidence that would authenticate it. That's a whole different problem. That's correct, Your Honor. May I ask one question about something that has not come up yet, and that's the attempt count in the indictment? Yes. Now, as I understand the defendant's argument, the argument is that there's no substantial step. I'm not very persuaded by that because if it's not a substantial step to ask somebody for money and then to make a whole bunch of false representations to get him to give you that money, I don't know what else you have to do to make a substantial step towards defrauding somebody. But you also have to show that there was an intent to commit the crime that the person is charged with aiding and abetting. Is there any evidence at all in the case that Whitehead intended to commit wire fraud? Can I just – you said aiding and abetting. You mean attempt? Attempt, I'm sorry. Attempt. It's a similar thing. You have to have the proof of what you do, substantial step or in the case of aiding and abetting, substantial assistance, and you have to have the intent to commit the crime. And is there any evidence that Whitehead intended to commit wire fraud? So there is – No doubt. But anything that suggests he would have said – if Belmonte had said here's a sack of dollar bills that add up to $500,000, by all means take it, and Whitehead absconded. Yes, Your Honor. Would he have said no? So part of the evidence here or a large part of the evidence included communications between Whitehead and Belmonte, and those were – Interstate wire communications? Yes, Your Honor, because Whitehead lived in New Jersey and Belmonte's – Okay, so there are in fact – there is in fact evidence that the fraud that was contemplated is wire fraud. Yes, Your Honor. That's the thing I wanted to know. Yes, Your Honor. Can I ask about the bank statements? So we talked about that in terms of the sophisticated means, but also a lot of the prior fraudulent bank statements were admitted under Rule 404B, right? And you said that that's admissible to prove identity because he said that he didn't submit the later one. Yes. But is it really – like so when we say that prior acts is admissible to prove identity, it has to be – the prior act has to be so distinctive that it's like a signature. But here – I mean isn't it a normal way to commit fraud to have fraudulent bank statements? So isn't the jury being invited to say, well, he submitted fraudulent documents in the past. He must have done it this time. So first, some of the statements – some of the doctored statements that he submitted were the same exact documents that he submitted to certain lenders. And second, the way that he doctored the documents was largely similar. The same – the exact same fraudulent bank statement.  So he submitted it on a prior occasion, but it is exactly the same one. Correct. Okay, but that's some of them. And so what were you going to say about that? And so the places in which the documents were doctored were largely similar. And so in that way, they were – And that distinguishes it from other sorts of fraudulent documents? Yes, Your Honor, because they were Wells Fargo documents. I mean everybody who's defrauding something at Wells Fargo would use the Wells Fargo format for a document. But you're saying, well, maybe because he uses the same element of fraudulence. So here – So it fills in information in a certain way. It becomes so distinctive. Here the applications – the fraudulent applications that the defendant submitted were to various lenders. And across all of these fraudulent applications, he submitted Wells Fargo bank statements. Some of those doctored bank statements were exactly the same. And some of those doctored bank statements were doctored in a very similar way across applications. Okay, so then on the sophisticated means enhancement, you heard opposing counsel say it's not a sophisticated means. People just submit fraudulent statements all the time. So why is this a sophisticated means? So here it's sophisticated means, as Your Honor pointed out, because we had a Wells Fargo witness who testified and identified these ways in which he knew that these documents were doctored, but an average lender might not have been able to identify them. The defendant also used multiple fraudulent bank accounts. He used different LLCs. And perhaps it's possible that with the benefit of Goldie that the court might not have applied the enhancement. But here there was ample evidence on the record to show that this was a case in which the enhancement did apply. But in any event, it doesn't matter because – Why isn't that a problem? It's not a problem because here Judge Schofield repeatedly said on the record that her sentence would be the same even if the guidelines range was different. That's at Appendix 1587. I thought that was as to the loss calculation. No, she says the sentence would be, quote, the sentence would be the same even if the guidelines range were different. Give me the page number again. That's the Appendix 1587. 1587. She says the sentence would be the same even if the guidelines range were different. And then she also says, I will also just reiterate, I'm not relying on the guideline calculation of loss because I think that is unsatisfactory for various reasons that I'm aware of.  That's the loss. That's what I'm saying. Yeah, that's at 1598. She was talking a little about the loss, but I didn't think at any point she said globally I don't care about the guidelines calculation here. Tell me where that – because I read this carefully and I –  Where? 1587. No, where? What line? Like I see page lines 18 to 20 where she's talking about I'm not relying on the guidelines calculation of the loss amount and that she said that's another way of saying my sentence would be the same even if the guidelines range were different. And then she goes on to then talk about the loss calculation. I never saw her say that globally at the end about the overall guidelines calculation, which included, say, sophisticated means or criminal history or anything like that. Sure. I understand what you're saying. So she says that at the end of that paragraph where she does talk about the loss. It's at lines – the end of line 22 to 24. And she says another – that's another way of saying that my sentence would be the same even if the guidelines range were different. Well, that seemed to be talking about with respect to the loss amount, not with respect to any other parts of – I don't know. That seems like it may be reading a little bit much into what she was saying. I know a lot of judges say that globally, but I don't know that – it seems like what she's talking about right there is the loss amount. So even if the loss amount changed and the guidelines range were different, she'd get the same thing. But not if everything changed. That seems like it's reading a little much into what she said. I'm not sure that – I understand the distinction. I'm not sure here that if the judge is saying I don't think that the loss amount is adequately captured in the guidelines and I don't think that the guidelines range is appropriate, so I'm not relying on it. I think that indicates that she was considering other factors, as she said on the record, including the seriousness of the offense, the perjury, the various prior convictions for crimes of dishonesty, the lack of deterrence by prior sentences. And she even stated that any one of these crimes would warrant a substantial sentence. A substantial sentence, not this substantial sentence. Did she ever reference the enhancement as something bearing on the final determination of sentence? She did not, Your Honor. And the reason you say that Goldie might have made a difference is because it's sophisticated but not necessarily sophisticated in comparison to the average crime of this type? I think that's correct. I think here the reason why it was sophisticated in the probation office also found that the enhancement applied included sort of the repeated nature, as I said earlier, the fact that an employee of Wells Fargo was the one to identify the documents and the doctored nature of the documents and the use of LLCs and bank accounts, and those are factors that are somewhat different than Goldie and the ones that were presented and that Judge Perez analyzed. All right. Well, thank you very much. We appreciate your argument, Mr. Adelstein. We've got three more minutes. Okay. Let me speedrun this, Judge. Starting with the sentencing, I would submit that the court's comments at 1587 do relate to the loss and are clarified by the court's additional comment at 1598, which is actually also cited in the government's brief, stating, I will also just reiterate I am not relying on the guidelines calculation of loss because I think that it is unsatisfactory for various reasons that I put on the record. So I think that corroborates that her comments at 1587 were to the loss. And then at 1637 of the appendix, the judge states, as I have said, I don't place a lot of weight on the guidelines here, going on then to explain why she didn't consider them very helpful. Not a lot is a different thing from none. So I don't think this is a case where it could be so certain, where the court can be so certain that the sentence would have been the same, that a remand is that it can just simply find the error harmless. And in terms of a Wells Fargo witness being called to, I guess, deauthenticate the Wells Fargo bank statements, well, that's who you call. If a defendant is presenting what the government alleges to be a bogus Wells Fargo bank statement, you don't call someone from HSBC. But if you need somebody who's familiar with the detailed nature of the way Wells Fargo does statements, doesn't that mean it's pretty sophisticated if you need somebody who's particularly versed in those statements to explain why this deviates from standard Wells Fargo practice? Well, I mean I think that anybody who has a Wells Fargo account could take a look at a Wells Fargo statement, see what they look like, put some fake numbers into it, and would look superficially reasonable to some lender who doesn't examine it, but might not to Wells Fargo. But doctoring it so that the fonts line up and everything's aligned, that actually takes a lot of care. And I would dare say sophistication to make it look physically like the real thing. You can't just get up there with typewriters and stuff these days and white out. I mean, you got to match the fonts to these very unique printouts. You can Photoshop, you can cut and paste. These days you can actually use AI and have the AI do it for you. That technology wasn't really available in 2022, I would agree with that. But certainly some very, very widely available to have Photoshop and other image manipulation software that, amateur photographers have this. High school students use it for projects. The only people who don't are aged court of appeals judges. I'm glad I'm not in the fraud business because, boy, I'd have to learn a whole lot of stuff that looks sophisticated to me. But it's a good point. It's a good point that what's sophisticated to me is not necessarily the same thing of what is sophisticated to the average 14-year-old. Aching criminal defense lawyers and appellate lawyers are not so sophisticated. But I take your point. And then briefly just on the returning to Belmonte. If you submit a false document to a bank on behalf of an auto body shop, that's a crime. It's bank fraud whether you own the body shop or not. If you're the accountant, if you're the owner's wife, if you're the owner's dog, whoever submits that statement has committed bank fraud. Ownership isn't an element. It's really not a question that is. Well, the government said that the standard we should use is anything that links into the prosecution that's going on and that includes ownership of the business. So if that's not the standard, what should the standard be for when it's permissible to invoke the Fifth Amendment? I would say that the question should have to have at least some bearing on the transactions for which the informant has been charged in the other case. Just some attenuated connection that there's an overlap with the same body shop. You're not suggesting though that if the Eastern District had called Mr. Belmonte before the grand jury and asked him what's your name, Belmonte, do you own this particular body shop? Are you saying he would not have been able to take the Fifth in response to that question? You mean if he's being called as a target? Well, I don't know whether he knows he's a target yet. He's a subject of the investigation. Now he's worse than a subject of the investigation. Now he's an indicted defendant. I mean ordinarily if you're being called by a grand jury, you know, to a grand jury, you have use immunity unless – No, no, no. Most people – no. You only get use immunity if the government thinks you're useful and is going to use you as a witness after they've gone through a range of proffers, et cetera, et cetera. Most people testify in the grand jury without immunity. If you don't have immunity, you take the Fifth if you think that there is anything that is going to lead to your possible conviction. Now, you might, but I'm not sure how you'd be able to do this, say, well, it's different whether you have that right in the grand jury than when you're called before a jury where somebody else's liberty is on the line. But the right is still yours. The right is still yours, and I'm not sure why if you say this couldn't really incriminate the person, then I don't know why an invocation of the Fifth should be accepted in any other context including his own trial. Well, I mean the right not to testify at your own trial is absolute whether it's – Yeah, because where did it come from? I mean if I'm on trial, even if my testimony is completely exculpatory, I could refuse to testify. So the intuition that he couldn't be compelled to say that is because even if we thought that it would not be incriminating at all, he still couldn't be compelled to say it. Well, okay, what about the grand jury? I mean it's the same thing. He's there. The government has every right to – the grand jury has the right to every man's evidence, so there he is to give evidence, and he's asked questions. And he knows what he's done, or at least he suspects what they think he's done. Can't he take the Fifth in response to any question that would tie him in any way whatsoever to the crime that the government is investigating? I mean if he invokes, then there would have to be a procedure just like what we were arguing in the district court as to whether it's a valid invocation, and if it is or it isn't, what do you do next? And you actually think that any court would say, well, I don't see what's harmful about owning a business in the Bronx. Anybody can own a business in the Bronx. So yeah, he has to answer that question. Well, let's go – let's go because the court has raised the issue of has the defendant come up with a single question that could make a difference at the trial. Let me see if I can answer both of those issues at the same time. Page 4 of the reply brief, I believe it's either 637 or 638 of the record. Did you promise Lamore Whitehead $5,000 for a rental reimbursement? You know, relating to whether the demand for $5,000 at a later time was extortion or just an attempt to collect legitimate debt. This was not a recorded conversation. This would not require him to admit that he owned as opposed to manage the body shop with it, you know, anything to do with it other than renting that particular car. Nothing at all to do with the charges in the Eastern District. And if he answered yes to that, the jury could have a quite different view of the later recorded conversations concerning the $5,000. So I would submit that if you go down the list of questions, I would certainly not concede that that's the only one. But I would submit at the very least there are questions that do not require him to incriminate himself with respect to ownership of the body shop and which are not duplicative of evidence at trial and which relate to legitimate issues before the jury. And I have again gone way over time, so if there are no further questions, I thank the court for the time and I'll rest on the briefs. And we thank you very much for taking the time to come in here. And, again, we will take this case under advisement and we thank both parties for, again, what were very, very helpful arguments in an interesting case. So thank you all. The court having completed the business for which it has been convened today, we will now stand adjourned.